UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| OXANA RAITER, OLGA SAMOYLOVA IRAM, ANDREY LEONTYEV AND EUGENE AZOV, Individually and on behalf of all other persons similarly situated,<br><br>               Plaintiffs,<br><br>          v.<br><br>DESSERT PALACE BOSE INC. d/b/a "EMMONS PALACE" and "DESSERT PALACE" and EFIM MILRUD, Jointly and Severally,<br><br>               Defendants. | ECF CASE<br><br>No.: _____<br><br><u>CLASS AND COLLECTIVE ACTION COMPLAINT</u><br><br>JURY TRIAL DEMANDED |

Plaintiffs Oxana Raiter, Olga Samoylova Iram, Andrey Leontyev and Eugene Azov hereby allege through their attorneys, Lipsky Lowe LLP, as against Defendants Dessert Palace Bose Inc. d/b/a "Emmons Palace" and "Dessert Palace" ("Emmons Palace") and Efim Milrud (collectively, "Defendants") as follows:

<u>NATURE OF THE ACTION</u>

1.      Defendants employed Plaintiffs Raiter, Samoylova, Leontyev and Azov at their restaurant in various waitstaff positions, including bartender, barista, cashier, server and busser, for several years, starting from approximately 2012 to September 2019[1].

2.      Plaintiffs assert on behalf of themselves and other similarly situated current and former employees of Defendants, under Fed. R. Civ. P. 23 (a) and (b), that Defendants willfully violated the New York Labor Law by (i) failing to pay the minimum wage, (ii)

---

[1] All date ranges and times in the Complaint are based on Plaintiffs' memory and good faith, best estimates.

failing to pay overtime premium pay, (iii) failing to pay for all hours worked, (iv) failing to pay spread-of-hours pay, (v) making unlawful deductions; (vi) failing to reimburse costs of uniforms and pay the additional required weekly amount for uniform laundering and maintenance; (vii) failing to provide the Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1; and (viii) failing to provide an accurate wage statement under N.Y. Lab. Law § 195.3 with every wage payment.

3.      Plaintiffs assert on behalf of themselves and other similarly situated current and former employees of Defendants and those who elect to opt into this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 216(b), that Defendants willfully violated the FLSA by (i) failing to pay the minimum wage, (ii) failing to pay overtime premium pay, (iii) failing to pay for all hours worked, and (iv) making unlawful deductions.

4.      Plaintiffs Raiter and Samoylova assert individual claims of gender discrimination, sexual harassment and hostile work environment under New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").

<u>JURISDICTION AND VENUE</u>

5.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiffs' FLSA claims under 29 U.S.C. § 216(b).

6.      Venue is proper in this District under 28 U.S.C. §§1391(b)(1) and (2): Defendant Emmons Palace is a resident of this District; and a substantial part of the events giving rise to the action occurred in this District.

7.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

THE PARTIES

8.      Plaintiff Raiter is and was, at all relevant times, an adult individual residing in Brooklyn, New York.

9.      Plaintiff Samoylova is and was, at all relevant times, an adult individual residing in Brooklyn and Long Island, New York.

10.     Plaintiff Leontyev is and was, at all relevant times, an adult individual residing in Brooklyn, New York.

11.     Plaintiff Azov is and was, at all relevant times, an adult individual residing in Brooklyn, New York.

12.     Defendant Emmons Palace is a domestic business corporation organized under New York law, with its principal places of business at 2265 and 2267 Emmons Avenue, Brooklyn, New York 11235.

13.     Defendant Emmons Palace is, upon information and belief, an enterprise engaged in commerce or in the production of goods for commerce. Emmons Palace is engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000.00. These goods and services include food, beverages, plates, cutlery and computers.

14.     Defendant Milrud is and was, at all relevant times, an adult individual residing on Staten Island, New York.

15.     Defendant Milrud owns, operates and controls Emmons Palace's day-to-day operations and management, is its principal and jointly employed Plaintiffs and other similarly employees at all relevant times.

16.     Defendants are covered employers within the meaning of the FLSA, the Labor Law, NYSHRL and NYCHRL and, at all relevant times, employed Plaintiffs and other similarly situated employees.

17.     Defendants had control over Plaintiffs' and other similarly situated employees working conditions and over the unlawful policies and practices detailed in this Complaint.

18.     Each Defendant, directly or indirectly, has hired Plaintiffs and other similarly situated employees and controlled their work schedule and employment conditions, determined their payment rates and method, and kept at least some records regarding their employment.

19.     Defendants employed more than 11 individuals at any one time.

<u>STATEMENT OF FACTS</u>

20.     Defendants operate and manage a Russian American restaurant located on 2265 Emmons Avenue, Brooklyn, New York 11235. The restaurant used to do business as Dessert Palace and, in the more recent years, started doing business as Emmons Palace.

21.     The restaurant is open every day of the year and its hours of operation are 11:00 a.m. to 12:00 a.m. from Monday through Sunday; however, the restaurant regularly stays open until approximately 1:00 a.m. on weekdays and until 2:00 a.m. on the weekends. As such, Defendants' employees are often required to work at least until 1:00 a.m. or 3:00 a.m., serving customers and performing side work and cleaning after the customers leave.

22.     As the principal and owner of Emmons Palace, Defendant Milrud is at the restaurant daily, interacting with customers and employees; he instructs employees what to do; he has the authority to and, does, in fact, hire and fire employees, change employees' pay and employee's schedules and set policies and practices for Defendants, including how they handle any complaints of discrimination and harassment at the workplace, and he is required by law to keep records regarding their employees' hours worked and compensation.

Dates Worked and Duties Performed[2]

23.     Plaintiff Raiter worked for Defendants as a bartender and barista from October 2014 to mid-April 2016, and then again from February 2017 to July 16, 2019.

24.     Plaintiff Samoylova worked for Defendants as a barista and cashier from June 2017 to July 5, 2019.

25.     Plaintiff Leontyev worked for Defendants from Summer 2012 to September 2019, in various positions, including as a busser, barista, bartender and cashier.

26.     Plaintiff Azov worked for Defendants as a server from 2013 to mid-November 2015.

27.     Plaintiff Raiter and Leontyev's duties as bartenders and baristas included preparing alcoholic drinks, hot drinks and coffee, cleaning the restaurants, serving customers food at the bar, handling cash and credit card transactions, closing out the register at the end of the night.

28.     Plaintiffs Samoylova and Leontyev's duties as baristas and cashiers included preparing coffee and hot drinks, cleaning the restaurant, serving ice cream and

_____

[2] These subject lines are included only for organizational purposes.

desserts to the customers, opening the restaurant, closing the restaurant, handling cash and credit card transactions, and closing out the register at the end of the night.

29.     Plaintiff Leontyev's duties as a busser included serving food to customers, folding and unfolding chairs and tables for the outside seating, setting up the chairs and tables inside and outside, cleaning the outside seating area, cleaning tables and chairs inside and outside, assisting servers with bringing out the food and collecting plates and glasses.

30.     Plaintiff Azov's duties as a server included taking customers' food and beverage orders, serving them food and drinks and performing non-tipped side-work each day, such as setting up tables, cleaning the restaurant, cleaning the tables and chairs, polishing silverware, folding napkins and etc.

31.     During their employment with Defendants, at any given time, upon information and belief, Plaintiffs worked with at least 4 to 15 other servers, 8 to 20 other bussers, 2 to 4 baristas, 1 to 2 cashiers and 1 to 2 bartenders. From personally observing and speaking with them, Plaintiffs know that their coworkers performed the same duties as them and were compensated in the same manner by Defendants. These coworkers include: Igor [last name unknown], Dima[last name unknown], Kolya[last name unknown], Iasha [last name unknown], Anya [last name unknown], Sveta [last name unknown], Vitya [last name unknown], Masha [last name unknown], Alsy [last name unknown] , Lena [last name unknown], Julia [last name unknown], Ella [last name unknown], Ai Solmishko, Aziz [last name unknown], Grisha [last name unknown], Jalil [last name unknown], Nico [last name unknown], and Jenia [last name unknown].

Hours and Days Worked

32.     During all relevant times except for the winter months (November to February), Defendants scheduled their employees to work in two shifts: the morning shifts, which start between 10:00 a.m. and 12:00 p.m.; and the evening shifts, which start between 1:00 p.m. and 5:00 p.m. Each shift generally lasts at least 10 hours. Defendants did not have a defined start and end time for the morning and afternoon shifts, rather the employees' schedules were staggered based on Defendants' needs, with some employees required to work the opening and closing shift on the same day resulting in them working 14 to 17 hours per day. During the winter months, Defendants generally scheduled only a single shift per day, sometimes sending employees home early on certain days, resulting in shifts lasting from 6 to 15 hours per day.

33.     Throughout their employment, Plaintiffs and other similarly situated employees regularly worked more than 40 hours per week.

Raiter's Hours

34.     During Plaintiff Raiter's employment, her schedule fluctuated, but, with the exception for winter months, she generally worked 5 to 6 days per week, from 2:00 p.m. to at least 2:00 a.m., equaling to at least 12-hour days and 60 to 72 hours per week.

35.     During the winter months, Plaintiff Raiter generally worked 4 days a week, from 12:00 p.m. to 12:00 a.m., equaling 12-hour days and 48 hours per week.

Samoylova's Hours

36.     During Plaintiff Samoylova's employment her schedule fluctuated, however, from June 2017 to February 2019, with the exception of the winter months, she generally worked 5 to 6 days per week. She usually worked the opening and closing shift,

starting at 11:00 a.m. and working until 12:00 a.m. on weekdays and until 1:00 a.m. to 3:00 a.m. on Friday to Sunday, equaling to 13 to 16-hour days and at least 65 to 78 hours per week.

37. During the winter months, Plaintiff Samoylova generally worked 3 to 4 days per week, from 11:00 a.m. to 12:00 a.m., equaling 13-hour days and 39 to 52 hours per week, with the exception when Defendants occasionally sent her home early if there were less customers than expected.

38. From February 2019 to July 5, 2019, Plaintiff Samoylova generally worked 5 days per week, with Wednesday and Thursdays off, working 3 days a week from 11:00 a.m. to 12:00 a.m. to 3:00 a.m. and 2 days a week from 1:00 p.m. to 12:00 a.m. or 3:00 a.m., equaling 11 to 16 hours per day and at least 61 to 76 hours per week.

39. During her employment, when a coworker took a week off once a year, Plaintiff Samoylova worked 7 days a week, further increasing her hours worked.

Leontyev's Hours

40. During his employment, Plaintiff Leontyev's schedule fluctuated, but, with the exception of the winter months, he generally worked 6 days per week, working the closing shift, from 4:00 p.m. to at least 2:00 a.m. or from 5:00 p.m. to at least 3:00 a.m., totaling at least 10 hours per day and 60 hours per week.

41. During the winter months, Plaintiff Leontyev worked 4 to 5 days per week, working the opening or closing shifts as needed, totaling at least 10 hours per day and 40 to 50 hours per week. However, these were not all the hours that he worked as he also regularly worked the opening and closing shift on the same day, thereby working as many as 12 to 16 hours per day, further increasing his hours worked per week.

42.     During Plaintiff Leontyev's employment, if Defendants were short staffed or if someone was sick or quit work, he worked 7 days per week, at least 10 hours per day and 70 hours per week. This occurred from 4 to 5 weeks a year.

Azov's Hours

43.     Plaintiff Azov's generally worked 5 days per week, working 2 days per week from 10:00 a.m. to 1:00 a.m. or 3:00 a.m. and 3 days per week from 3:00 p.m. to 1:00 a.m. or 3:00 a.m., totaling between 10 to 17 hours per day and 60 to 70 hours per week.

44.     Defendants did not provide Plaintiffs with 30-minute uninterrupted meal breaks.

45.     From reviewing their schedules, speaking with their coworkers and personal observations, Plaintiffs know that other similarly situated employees, including bartenders, baristas, cashiers, bussers and servers, like them, regularly worked more than 10 hours per day and more than 40 hours per week.

Hourly Rate, Spread-of-Hours, Overtime

46.     Despite working these long hours, Defendants failed to pay Plaintiffs and their coworkers all the wages that they are entitled to.

47.     Defendants paid Plaintiffs Raiter, Samoylova and Leontyev, who worked as bussers, bartenders, baristas and cashiers, an hourly rate of pay for their straight time and some overtime hours, regardless of how many hours they worked.

Rates of Pay

48.     Defendants paid Plaintiff Raiter an hourly rate of $9.50 from May 2015 to May 2016, $10.50 from May 2016 to February 2017, $14.00 from February 2017 to May

2017, $15.00 from May 2017 to May 2018, $16.00 from May 2018 to May 2019, and $17.00 from May 2019 to the end of her employment.

49.     Defendants paid Plaintiff Samoylova an hourly rate of $9.00 from June 2017 to June 2018, $10.00 from June to October 2018, $11.00 from October 2018 to June 2019 and $14.00 from June to July 2019.

50.     Defendant paid Plaintiff Leontyev an hourly rate between $8.00 and $13.00: Defendants paid him an hourly wage of $8.00 from mid-2015 to mid-2016; $9.00 from mid-2016 to mid-2017; $10.00 from mid-2017 to mid-2018; $11.00 from mid-2018 to mid-2019; and $13.00 from mid-2019 to September 2019.

Gratuities and Lack of Hourly Wages for Azov and Other Similarly Situated Servers

51.     As a busser, bartender, baristas and cashiers, Plaintiffs Raiter, Samoylova and Leontyev almost never received tips from customers, most often receiving between $0 to $2.00 per day in tips.

52.     Defendants' customers regularly left Plaintiff Azov and other similarly situated servers gratuities, in cash or on credit card, for their services.

53.     Defendants had no policy or practice to track how much in tips Plaintiffs and other employees received on a daily or weekly basis.

54.     Defendants failed to pay Plaintiff Azov *any* hourly rate of pay for *any* of the hours that he worked. Instead, Defendants made him work *only* for gratuities left to him by customers.

55.     Plaintiff Azov knows that Defendants did not pay *any* hourly wages to any of their servers, making them only work for gratuities left to them by customers.

56.     Defendants failed to pay Plaintiff Azov and other similarly situated employees the minimum wage.

57.     The following chart shows the minimum wage under the New York Labor Law for the relevant years for employers with more than 11 employees:

|           | 2015   | 2016   | 2017    | 2018    | 2019    | 2020    |
|-----------|--------|--------|---------|---------|---------|---------|
| Labor Law | $8.75  | $9.00  | $11.00  | $13.00  | $15.00  | $15.00  |

58.     Plaintiffs Raiter, Samoylova and Leontyev's regular hourly rates repeatedly dipped below the required New York minimum wage requirements.

59.     Plaintiffs had to repeatedly ask Defendant Milrud to raise their wages every year. When Plaintiff asked Defendant Milrud to raise their wages to or above minimum wage requirements, he refused. If Defendant Milrud raised their wages, he did so out of his discretion and when he pleased.

60.     Although Plaintiffs and other similarly situated employees regularly worked more than 40 hours per week, Defendants did not pay Plaintiffs overtime premium pay: 1.5 times their regular hourly rate.

61.     Defendants paid Plaintiffs Raiter, Samoylova and Leontyev their regular rates of pay for their straight time and some, but not all, of their overtime hours worked, failing to pay them their overtime premium for any hour they worked above 40.

62.     Defendants failed to pay Plaintiff Azov *any* wages for his overtime hours.

63.     Plaintiffs regularly worked more than 10 hours in a day, but Defendants did not pay them spread-of-hours pay: an extra hour at the minimum wage.

Defendants' time keeping policies and procedures

64.     Defendants did not require Plaintiffs to clock in or clock out.

65.     Defendants asked Plaintiffs and other similarly situated employees to write down their hours in their phones or notebooks and then give this information to Defendant Milrud at the end of the week to get paid.

66.     When Plaintiffs and their coworkers turned in their hours to Defendant Milrud, he regularly disputed the hours that they had written down and regularly deducted some time off their hours worked.

67.     Defendant Milrud yelled and admonished Plaintiff Leontyev for allegedly working too many hours, telling him that he spent too long on cleaning tasks and he should have done some tasks quicker.

Defendants' policy of not paying for all hours worked

68.     Defendant Milrud failed to pay Plaintiff Leontyev for the hours that he disputed and for the tasks that he alleged took too long performing, regularly deducting time from his hours worked at his discretion.

69.     Plaintiff Leontyev estimates that during his employment, Defendant Milrud deducted 1 to 2 hours from his hours worked per week.

70.     Plaintiff Raiter regularly noticed that Defendant Milrud failed to pay her for *all* the hours worked and that wages for some hours were missing from her pay.

71.     If Plaintiff Raiter noticed the discrepancy in her pay, by double checking her pay and the hours she worked that week, she would tell Defendant Milrud that he failed to pay her for all the hours worked and that wages were missing. Upon hearing this, he would sometimes pay her the missing hours. However, if she failed to double check, Defendants failed to pay her the deducted hours.

72.     Defendant Milrud yelled and admonished Plaintiff Samoylova multiples times for working long shifts and pressured her to write down less hours than she actually worked each day. As a result, out of fear of angering him and fearing to lose her job, Plaintiff Samoylova subtracted 1 to 2 hours from each day she worked from her notes.

73.     Despite witnessing her work the long hours at the restaurant and having knowledge of the actual hours she worked, Defendants failed to pay Plaintiff Samoylova the hours that they forced her to subtract from her notes, failing to pay her 5 to 6 hours per week during most of her employment.

Unlawful deductions

74.     If a customer failed to pay their bill, Defendants deducted that customer's bill from Plaintiff Azov and other similarly situated servers' tips.

75.     Plaintiff Azov estimates that each deduction was at least $100.00 per customer bill. Defendants deducted wages at least twice from his wages during his employment.

76.     Upon information and belief, Defendants deducted wages from Plaintiffs and other similarly situated employees on regular basis, failing to pay them for all the hours worked during their employment.

77.     Upon information and belief, Defendants' deductions from Plaintiffs' and the other similarly situated employees' wages, further lowered their hourly rates of pay below the minimum wage requirements.

Non-Tipped Side-Work

78.     During their employment with Defendants, Plaintiffs and other similarly situated employees were regularly required to perform non-tipped side-work, including

folding napkins, cleaning the bar, the fridge, tables, floors, walls, cleaning the toilets, sweeping and cleaning the restaurant and its exterior, carrying dirty dishes, setting up and breaking down outside chairs and tables, cleaning and polishing plates, glasses and silverware, packaging food for delivery and pick up and taking out garbage ("Non-Tipped Work").

79.     Like Plaintiff Azov, the similarly situated servers did not receive *any* hourly wage compensation for the Non-Tipped Work.

80.     From speaking with them, Plaintiffs know that other bartenders, baristas, cashiers, servers and bussers, like them, were not paid any minimum or overtime hourly wage, were paid below the statutory minimum wage, were not paid for all hours worked, were not paid overtime premium pay, were not paid spread-of-hours pay, did not receive 100% of their tips, and had deductions from their compensation when customers did not pay their bill.

Uniform Violations

81.     Defendants required Plaintiffs Leontyev and Azov and other similarly situated employees who worked as servers and bussers to purchase and wear a specific uniform, which includes uniform red or white shirts with the restaurants' logo.

82.     Plaintiff Raiter and Samoylova did not wear uniforms during their employment.

83.     Plaintiff Leontyev and Azov and other similarly situated employees were required to buy the uniforms from Defendants. They spent between $5.00 to $10.00 per shirt uniform and were had to buy 4 to 6 of them per year.

84.     Defendants failed to reimburse Plaintiffs Leontyev and Azov and the similarly situated employees for the cost of the uniforms.

85.     Defendants failed to pay Plaintiffs Leontyev and Azov and the similarly situated employees an allowance for the care, maintenance and cleaning of their uniforms, which Defendants required them to wear during their employment for the Defendants.

86.     As a result of not reimbursing or compensating them for their uniform expenses and maintenance, Defendants effectively further reduced Plaintiffs Leontyev and Azov's and other similarly situated employees' wages below the statutory minimum wage requirement.

Labor Law Notice and Wage Statement Violations

87.     Defendants paid Plaintiffs part in cash and part by company check once per week.

88.     Defendants failed to provide Plaintiffs and other similarly situated employees with the Notice and Acknowledgment of Payrate and Payday under N.Y. Lab. Law § 195.1 when they were hired or at any point in their employment.

89.     Defendants did not provide Plaintiffs or similarly situated employees with an accurate wage statement under N.Y. Lab. Law § 195.3 with any wage payment.

90.     Defendants did not post at the restaurant a poster advising Plaintiffs and other employees of their right to a minimum wage and overtime premium pay.

<u>Gender Discrimination and Sexual Harassment against Plaintiffs Raiter and Samoylova</u>

91.     During their employment, Defendants instigated, encouraged and condoned gender discrimination and sexual harassment towards Plaintiffs Raiter and Samoylova and other female employees at work on regular basis.

92.     Defendant Milrud personally instigated, nurtured and encouraged a constant pattern and practice of gender discrimination and sexual harassment against Plaintiffs Raiter and Samoylova and other female employees at Emmons Palace, repeatedly failing to discipline any of the male employees who partook in the sexual harassment and discrimination.

93.     Defendant Milrud often commented on Plaintiffs Raiter and Samoylova's and other female employees' appearance and body weight, often calling them "fat" or telling them to lose weight.

94.     Defendant Milrud would regularly pass by Plaintiff Raiter and tell her in Russian: "you should lose some weight in your as*"

95.     On one occasion during her employment, Plaintiff Raiter was talking to Defendant Milrud and told him that her teenage daughter has recently lost some weight, in response he replied "it would be better if your as* lost some weight."

96.     Defendant Milrud did not call male employees fat or tell them to lose weight.

97.     During Plaintiffs Raiter and Samoylova's employment, Defendant Milrud routinely sexually harassed them and made nonconsensual physical contact with their bodies and inappropriate, sexual and aggressive comments towards them, including comments about their breasts and buttocks.

98.     On multiple occasions, Defendant Milrud approached Plaintiff Raiter from behind when she was not looking, performing work such as cleaning the fridge, and touched her buttocks or her lower back.

99.     On multiple occasions, when Plaintiff Raiter used a ladder near the dishwasher to reach for juices on the shelves, Defendant Milrud repeatedly used this as an opportunity to touch her buttocks.

100.    Defendant Milrud took every opportunity to crowd Plaintiff Raiter and Samoylova behind the bar or in a narrow space in order to touch their lower back or shoulders when passing by them or lean his body tightly against theirs.

101.    Defendant Milrud created a hostile work environment towards women at Emmons Palace and openly derived enjoyment when others around him did the same. He regularly encouraged his male employees, including management, to sexually harass, insult and discriminate against Defendants' female employees, rewarding them with friendly attitude or better employment conditions and failing to reprimand or discipline them.

102.    For instance, in mid-April 2016, Defendants' chef, a male employee, named Misha [last name unknown], heard someone calling Plaintiff Raiter a "young woman" in Russian. In response, in front of customers and one of Defendants' upper management, Oleg Katayev, the chef shouted: "she is no young woman, a train can pass through [her vagina]."

103.    Defendants' upper management found the chef's comments entertaining and laughed. Defendants did not discipline or reprimand the chef.

104.    Plaintiff Raiter was humiliated, extremely shocked and emotionally distressed by this incident. When she got home, she cried for several hours.

105.    After the April 2016 incident, Plaintiff Raiter quit working for Defendants because of emotional distress and being unable to work under such unbearable working conditions that were hostile towards women.

106.    Defendant Milrud employs his longtime female friend, Lena [last name unknown] ("Chef Lena") as a chef at Emmons Palace. On top of her chef's duties, she has the authority to hire, fire and discipline Defendants' employees, including Plaintiffs.

107.    In February 2017, Chef Lena asked Plaintiff Raiter to return to work at Emmons Palace and promised that the work environment had improved.

108.    After Chef Lena hired her back and Plaintiff Raiter returned to work for Defendants, the hostile work environment and sexual harassment continued to get worse.

109.    From 2017 to 2019, Defendant Milrud continued to make sexual and inappropriate comments to Plaintiff Raiter. He regularly commented that Plaintiff Raiter "must be looking for a 'sponsor,'" and made inappropriate sexual jokes, implying that she is a sex worker for hire.

110.    Defendant Milrud regularly stated that Plaintiff Raiter must be attracting "prostitutes like herself to work at the restaurant," and that all female employees working for Defendants are "only strictly whores."

111.    In the Fall 2018, when Plaintiff Raiter climbed the ladder at the restaurant, Defendant Milrud slapped her buttocks with force and then said in Russian "Not bad, that's impressive."

112.    In late 2018 and early 2019, Defendant Milrud often came to Plaintiff Samoylova looking for Plaintiff Raiter and asked "what is [Raiter] doing? Is she fuc*ing

with someone?" He also habitually asked "where is [Raiter]? She must have been fuc*ing and drinking all night yesterday?

113.    Once a week, Plaintiff Samoylova was tasked with cleaning the fridge for ice cream near the bar. On multiple occasions, when Defendant Milrud saw her clean the fridge he purposely came behind her and, as she was bending over, touched her buttocks with his pelvis leaning his body weight on her.

114.    In the summer of 2018, Plaintiff Samoylova lost over 80 pounds of weight.

115.    Seeing Plaintiff Samoylova's visible weight loss, one of Defendants' customers and Defendant Milrud's friend, Boris [last name unknown], who himself is overweight, asked her how she managed to lose so much weight. Not giving her a chance to respond, Defendant Milrud loudly interrupted, in Russian, "well of course she lost weight, all she does is fu*k a lot and not eat," in front of other staff members.

116.    Plaintiff Samoylova was insulted, shocked, humiliated and severely emotionally distressed by Defendant Milrud's behavior and comments. She immediately confined in Plaintiff Raiter and told her about the discriminatory comments.

117.    Perpetuating Defendants' culture of disrespect and sexual aggression towards female employees, once when Plaintiff Samoylova was serving ice cream to Defendant Milrud's friends at the restaurant, one of the men asked her to "come and spend the night with [him]." When she refused, he insinuated that she was lucky that he asked her and said "shame, women like you [that are overweight] always like me." Defendant Milrud did not reprimand or stop this man's sexual harassment of Plaintiff Samoylova.

118.    On another occasion in 2019, another one of Defendant Milrud's friends and customers, Sasha [last name unknown], asked another female employee, Ella [last

name unknown] on a date, but then told her that it would be best that she stop working for Defendants because Defendant Milrud told him that "only prostitutes work [at Emmons Palace]."

119.    At all relevant times, Chef Lena was in her late 50s/ early 60s and openly displayed discriminatory behavior and made sex-related comments towards female employees, especially women that are younger than her, like Plaintiffs Raiter and Samoylova.

120.    During Plaintiffs Raiter and Samoylova's employment, Chef Lena often harassed and bulled them and other female employees, constantly making sex- and weight-related comments to them with Defendant Milrud or in front of him.

121.    Chef Lena did not harass or bully male employees.

122.    Chef Lena routinely called Plaintiff Raiter and Samoylova "prostitutes" and "whores" at work. She also told a female employee, Ella [last name unknown] to "remove that lipstick of your lips" and implied that she looked like a sex worker.

123.    Chef Lena told Plaintiff Raiter and Samoylova that "they grew a [big] as*" and that "[their] breasts were sticking out."

124.    Chef Lena constantly commented on Plaintiffs Raiter and Samoylova's and other female employees' weight and told them to get thinner and stop eating.

125.    In April 2018, Chef Lena approached Plaintiffs Raiter and Samoylova because she needed a juice from the upper shelving. Plaintiff Raiter went to climb the ladder to get the juice, but Chef Lena stopped her and told her "don't climb the ladder, make [Samoylova] climb it, since she has grown such a big a*s . . . . so she should climb."

126.     In March 2019, Plaintiff Raiter came to Emmons Palace wearing a red sweater to pick up Plaintiff Samoylova after work. Upon seeing Plaintiff Raiter, Chef Lena commented, in front of Defendant Milrud, that "[Raiter] dressed up as a whore" and asked Plaintiffs Raiter and Samoylova where they were going? Defendant Milrud looked pleased with the questions and laughed, failing to reprimand or discipline Chef Lena.

127.     The next day when Plaintiffs Raiter and Samoylova came to work, the male employees asked them "so how was your night? Did you get enough fuc*ing?" Once again, Defendants failed to reprimand the male employees for their inappropriate comments.

128.     In May 2019, when a food supplier, Roma [last name unknown] delivered frozen food to Emmons Palace, he asked Plaintiff Samoylova where Plaintiff Raiter was. Interjecting into the conversation, Chef Lena replied for Plaintiff Samoylova in Russian that "[Raiter] must be whoring around somewhere… because she is whore #1, and [pointing directly at Samoylova] this is whore #2."

129.     Chef Lena also verbally abused, threatened and terrorized Defendants' female employees at work, often pointing at them and saying that she could fire them if she wants because "[Defendant Milrud] was in her power" and did a grabbing gesture with her hand to indicate that she has control over him.

130.     In 2018 and 2019, due to continued harassment and discrimination, Plaintiff Samoylova began experiencing severe emotional distress, resulting in severe anxiety, depression, crying spells, inability to sleep, gastrointestinal symptoms, headaches, and general loss of enjoyment of life. She was afraid to eat or snack at work because she would be bullied about her weight and developed a fear of eating.

131.    The constant sexual harassment and gender discrimination during her employment with Defendants, made Plaintiff Samoylova dread coming to work as she knew that she would be subject to unwanted sexual harassment, comments, insults and jokes.

132.    On July 5, 2019, as a result of Defendants' discrimination, Plaintiff Samoylova left her employment at Emmons Palace.

133.    Any reasonable person in Plaintiff Samoylova's position would have left their employment with Defendants.

134.    In July 2019, Defendant Milrud was sitting at the bar at Emmons Palace while Plaintiff Raiter was working behind the bar. A customer came and stood at the bar next to him, looked at Plaintiff Raiter and said "great looking tits."

135.    Hearing the customer comment on Plaintiff Raiter's breasts, Defendant Milrud laughed and displayed approval of his comment, failing to intervene or protect her in any way.

136.    Plaintiff Raiter became visibly shocked and embarrassed at the customer's inappropriate comments. Seeing her reaction, the customer took out $5.00 and offered it to her as a tip for his inappropriate comment. She refused to accept the money.

137.    Seeing that Plaintiff Raiter refused the customer's money, Defendant Milrud picked up the $5.00 from the bar and threw it directly at her face, shouting "you got five dollars for nice tits. You take it!"

138.    Defendants' other employees witnessed Defendant Milrud throwing the money at Plaintiff Raiter's face, including bussers Aziz [last name unknown] and Jalil [last name unknown].

139.    Plaintiff Raiter broke down crying at work and could not stop for several hours after work.

140.    Defendants' aggressive, sexualized behavior and discrimination against Plaintiff Raiter caused her significant emotional distress.

141.    The next day after the incident, Plaintiff Raiter told Defendant Milrud that she could no longer work for him because of his outrageous behavior. Defendant Milrud did not apologize or acknowledge what happened, instead her told her to relax and that it was a joke.

142.    On July 16, 2019, Plaintiff Raiter was unable to return back to work because of Defendants' discrimination and hostile work environment at work.

143.    Any reasonable person in Plaintiff Raiter's position would have terminated their employment with Defendants.

144.    Due to continued sexual harassment and discrimination, Plaintiff Raiter was subjected to severe emotional distress, including severe anxiety, depression, crying spells, inability to sleep, gastrointestinal symptoms and general loss of enjoyment of life, feelings of dread, fear of coming to work and fear of losing her job if she spoke up against Defendants' hostile work environment against women.

145.    Several other female employees also had to quit their positions at Defendants' restaurants because of their rampant discrimination and sexual harassment of them.

146.    During their employment, Plaintiffs observed how Defendant Milrud and Chef Lena daily yelled, harassed and made inappropriate comments to several female employees, including Anya [last name unknown], Sveta [last name unknown] and Masha

[last name unknown], Alsy [last name unknown], Lena [last name unknown], Julia [last name unknown], Ella [last name unknown] and Ai Solmishko.

147.    In 2019, both Anya [last name unknown] and Sveta [last name unknown], quit their jobs at Defendants' restaurant as a result of the hostile work environment, constant sexual harassment and gender discrimination.

148.    Any reasonable person in Anya and Sveta's position would have terminated their employment.

149.    As the result of Defendants' harassment and discrimination, Anya [last name unknown] had to seek medical help for her emotional distress and, upon information and belief, she was diagnosed with severe depression and was prescribed and took anti-depressant medication.

150.    Sveta [last name unknown] suffered and still suffers severe emotional distress because of Defendants' harassment and discrimination of women.

151.    In 2018 and 2018, during her employment with Defendants, Masha [last name unknown] became so emotionally distressed by Defendant Milrud and Chef Lena's behavior that she repeatedly cried at work.

152.    In 2018 and 2019, Plaintiffs Raiter and Samoylova observed Masha [last name unknown] crying in the kitchen during her shifts almost every day after Defendants subjected her to sexual harassment and discrimination on the daily.

153.    In 2019, Masha [last name unknown] quit her job at Defendants. But soon after, because she needed a job, she had to come back to endure further harassment and discrimination at Defendants' restaurant.

154.     Defendants did not sexually harass their male employees. Defendants did not comment on their male employees' buttocks, chest, appearance, weight, clothes or sex life.

155.     Defendants treated Plaintiffs Raiter and Samoylova and their other female employees less well than their male employees because they subjected them to continual and constant sexualized work environment, sexual harassment and discrimination.

156.     At all relevant times, Defendants were aware of the repeated and continuous gender discrimination, hostile work environment and the sexual harassment at their workplace, but they permitted it to continue unremedied for so long as to amount to a discriminatory policy and practice.

157.     Plaintiff Raiter and Samoylova were effectively constructively discharged as Defendants created a work atmosphere that is so hostile and intolerable, permeated with constant harassment and gender discrimination, that no reasonable person could withstand it and would also be forced to quit.

158.     As a result of Defendants' sexual harassment and discrimination of Plaintiffs Raiter and Samoylova have suffered and continue to suffer, *inter alia*, lost wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

<u>CLASS ACTION ALLEGATIONS</u>

159.     Plaintiffs assert these allegations and claims on their own and on behalf of two classes of persons under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3):

> <u>Subclass A:</u> All persons whom Defendants employ and have employed who were bartenders, baristas, cashiers, bussers, servers and other comparable tipped positions at any time since August 5, 2015 to the entry of judgment

in this case (the "Class Period"), who were non-exempt employees within the meaning of the New York Labor Law (the "Class Members A").

Subclass B: All persons whom Defendants employ and have employed who were bussers and servers and other comparable tipped positions who were required to purchase and wear uniforms during their employment with Defendants during the Class Period, who were non-exempt employees under the New York Labor Law ("Class Members B").

160.    The Class Members A and B ("Class Members") identified above are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within Defendants' sole control, upon information and belief, more than 40 Class Members exist.

161.    Plaintiffs' claims are typical of the Class Members', and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.

162.    Defendants have acted or refused to act on grounds generally applicable to the Class Members, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class Members.

163.    Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in employment law, wage and hour law, and class action litigation.

164.    Plaintiffs have the same interest in this matter as all other Class Members and their claims are typical of Class Members'.

165.    Common questions of law and fact exist as to the Class Members that predominate over any questions solely affecting the individual Class Members, including:

a.      whether Defendants employed Plaintiffs and the Class Members, individually or jointly, within the meaning of the Labor Law;

b.      whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiffs and the Class Members;

c.      what proof of hours worked is sufficient where employers fail in their duty to maintain time records;

d.      whether Defendants failed or refused to pay the Plaintiffs and the Class Members minimum wages, overtime premium pay for all hours worked in excess of 40 hours per workweek, and spread-of-hours pay;

e.      whether Defendants made unlawful deductions from the Plaintiffs' and Class Members' wages;

f.      whether Defendants maintained adequate records of the tips that the Plaintiffs and Class Members received;

g.      whether Defendants failed to reimburse Class Members B for uniform expenses and maintenance;

h.      whether Defendants failed to provide the Plaintiffs and Class Members with wage notices and wages statements under Labor Law §§ 195.1 and 195.3;

i.      whether Defendants failed to post or keep posted a notice explaining the minimum wages and overtime pay rights provided under the Labor Law in any area where Plaintiffs and the Class Members are employed;

j.      whether the individual Defendant Milrud participated in the day-to-day management of the restaurant and is "joint employers" and liable to Plaintiffs and the Class Members;

k.      whether Defendants are liable for all damages claimed hereunder, including but not limited to, interest, costs and disbursements and attorneys' fees; and

l.      whether Defendants should be enjoined from such violations of the Labor Law in the future.

<u>COLLECTIVE ACTION ALLEGATIONS</u>

166.    Under 29 U.S.C. § 206, Plaintiff Raiter, Samoylova and Leontyev seek to assert these allegations and claims as a collective action:

> All persons whom Defendants employ and have employed who were servers, bartenders, baristas, cashiers and bussers other comparable tipped positions at any time since August 5, 2018 to the entry of judgment in this case (the "Collective Action Period"), who were non-exempt employees within the meaning of the FLSA (the "Collective Action Members") and who were not paid overtime premium pay, for all hours worked and were subject to unlawful deductions under the FLSA.

167.    Plaintiffs Raiter, Samoylova and Leontyev and the Collective Action Members are similarly situated on several legal and factual issues, including:

a.      whether Defendants employed the Plaintiffs Raiter, Samoylova and Leontyev and Collective Action Members within the meaning of the FLSA;

b.      whether the Plaintiffs Raiter, Samoylova and Leontyev and Collective Action Members performed similar duties;

c.      whether Defendants willfully or recklessly violated the FLSA; and

d.      whether Defendants failed to pay the Plaintiffs Raiter, Samoylova and Leontyev and Collective Action Members overtime compensation for hours worked in excess of 40 hours per workweek, violating the FLSA and the regulations promulgated thereunder.

## FIRST CAUSE OF ACTION
**FAILURE TO PAY OVERTIME PREMIUM PAY**
**UNDER THE FLSA**
**(On Behalf of Plaintiffs Raiter, Samoylova, Leontyev and the Collective Action Members)**

168.     Plaintiffs repeat and reallege every allegation of the preceding paragraphs as if set forth fully herein.

169.     Plaintiffs consent in writing to be a party to this action under 29 U.S.C. §216(b), which is attached to this Complaint and incorporated by reference.

170.     Defendants employed, and/or continue to employ, Plaintiffs and the Collective Action Members within the meaning of the FLSA.

171.     Defendants were required to pay Plaintiffs and the Collective Action Members no less than one and 1.5 times the regular rate at which they were paid for all hours worked in excess of 40 hours in a workweek under the overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a).

172.     At all relevant times, Defendants had a policy and practice of refusing to pay overtime compensation to their employees for their hours worked in excess of 40 hours per workweek.

173.     Defendants were aware or should have been aware that the practices described in this Complaint were unlawful, making their violations willful or reckless.

174.     Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies under 29 U.S.C. § 255 and should be equitably tolled between the filing of this lawsuit and when the Court conditionally certifies the collective action.

175.     Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiffs and the Collective Action Members' compensation.

176.    Defendants also deducted at least some of the overtime hours from Plaintiffs and Collective Action Members' paystubs, failing to pay them *any* wages for those overtime hours. Defendants have failed to make, keep and preserve records with respect to their employees sufficient to determine the wages, hours, and other conditions and practices of employment, violating the FLSA, 29 U.S.C. §§ 201, 207(a)(1) and 215(a).

177.    In failing to compensate Plaintiffs and the Collective Action Members for all compensable hours worked, Defendants violated the FLSA and the regulations thereunder, including 29 C.F.R. §§ 785.13, 785.11.

SECOND CAUSE OF ACTION
FAILURE TO PAY THE MINIMUM WAGE
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

178.    Plaintiffs repeat and reallege every allegation of the preceding paragraphs as if set forth fully herein.

179.    Defendants are "employers" under N.Y. Lab. Law §§ 190, 196-d, 651(5), 652 and supporting New York State Department of Labor Regulations and employed Plaintiffs and the Class Members.

180.    The wage payment provisions of Article 6 of the Labor Law and supporting New York State Department of Labor Regulations apply to Defendants and protect Plaintiffs and the Class Members.

181.    Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiffs and the Class Members the statutory minimum wage.

182.    Upon information and belief, Defendants failed to post, in a conspicuous place upon their premises a notice issued by the New York State Department of Labor

summarizing minimum wage provisions, violating the Labor Law and supporting New York State Department of Labor Regulations. 12 N.Y.C.R.R. §§ 137-2.3, *et seq.*

183.   Defendants paid Plaintiffs and the Class Members below the statutory minimum wage.

184.   Defendants are liable to Plaintiff and the Class Action Members for the difference between the hourly rate at which they paid them, if any, and the full statutory minimum wage.

185.   Defendants willfully violated the Labor Law by knowingly and intentionally failing to pay Plaintiffs and the Class Members the minimum wage.

186.   Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre and post-judgment interest.

THIRD CAUSE OF ACTION
FAILURE TO PAY THE OVERTIME PREMIUM PAY
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

187.   Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

188.   Defendants are employers under N.Y. Lab. Law §§ 190, 196-d, 651(5), 652 and supporting New York State Department of Labor Regulations and employed Plaintiffs and the Class Members.

189.   Under the Labor Law and supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiffs and the Class Members 1.5 times their regular rate of pay for all hours they worked in excess of 40.

190.    Defendants failed to pay Plaintiffs and the Class Members the overtime wages to which they were entitled, violating N.Y. Lab. Law § 650 and Part 142, § 142-2.2 of Title 12 of the Official Compilation of Codes, Rules and Regulations promulgated by the Commissioner of Labor pursuant to the Minimum Wage Act.

191.    Defendants willfully violated the Labor Law by knowingly and intentionally failing to pay Plaintiffs and the Class Members the correct amount of overtime wages.

192.    Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre and post-judgment interest. N.Y. Lab. Law § 663.

FOURTH CAUSE OF ACTION
FAILURE TO PAY SPREAD-OF-HOURS PAY
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

193.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

194.    Defendants failed to pay Plaintiffs and the Class Members additional compensation for one hour's pay at the basic minimum hourly wage for each day during which they worked more than 10 hours (i.e., "spread-of-hours pay"), violating 12 N.Y.C.R.R. § 146-1.6.

195.    By failing to pay Plaintiffs and the Class Members spread-of-hours pay, Defendants have willfully violated the New York Lab. Law Article 19, §§ 650 et seq. and the supporting New York State Department of Labor Regulations.

196.    Due to Defendants' Labor Law violations, Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours wages, statutory

liquidated damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other legal and equitable relief as this Court deems just and proper.

<u>FIFTH CAUSE OF ACTION</u>
UNLAWFUL DEDUCTIONS
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

197.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege every allegation of the preceding paragraphs as if fully set forth herein.

198.    The unpaid wages at issue in this claim are "wages" under N.Y. Lab. Law § 190(1).

199.    N.Y. Lab. Law § 193 prohibits deductions from wages that are not made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency and are not expressly authorized in writing by the employees and are not for the benefit of the employee.

200.    N.Y. Lab. Law § 198-B(2) prohibits persons from, *inter alia*, requesting, demanding, or receiving, either before or after such employee is engaged, a return, donation, or contribution of any part or all of said employee's wages, salary, supplements, or other thing of value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such employee from procuring or retaining employment.

201.    Defendants violated the Labor Law in deducting from Plaintiffs and the Class Members' wages for meals that customers did not pay and by deducting disputed hours from their pay.

202.    Due to Defendants' violations of the Labor Law, Plaintiffs and the Class Members are entitled to recover from them the unlawfully deducted wages, liquidated

damages, reasonable attorneys' fees, costs, and pre and post-judgment interest. N.Y. LAB. LAW § 633(1).

SIXTH CAUSE OF ACTION
UNIFORM VIOLATIONS
UNDER THE NEW YORK LABOR LAW
(Brought on Behalf of Plaintiff Leontyev and Azov and Class Members B)

203.    Plaintiffs Leontyev and Azov repeat and reallege each and every allegation of the preceding paragraphs as if fully set forth herein.

204.    Defendants failed to pay Plaintiffs Leontyev and Azov and the Class Members B the full amount of their wages as a result of deductions for uniform-related expenses, violating Labor Law Article 6 § 193 and the supporting New York State Department of Labor Regulations, 12 N.Y.C.R.R. § 137-2.5.

205.    Defendants required Plaintiffs Leontyev and Azov and the Class Members B to purchase specific uniforms from them and those uniforms while working.

206.    Defendants failed to reimburse Plaintiffs Leontyev and Azov and the Class Members B for the cost of the uniforms, violating 12 N.Y.C.R.R. § 137-1.8.

207.    Additionally, Defendants failed to launder or maintain the uniforms that they required Plaintiffs Leontyev and Azov and the Class Members B to wear and failed to pay them the required weekly amount for such laundering and maintenance.

208.    Due to Defendants' violations of the Labor Law, Plaintiff Leontyev and Azov and the Class Members B are entitled to recover from Defendants their costs for purchasing the uniforms, unpaid uniform related expenses, statutory liquidated damages, reasonable attorneys' fees, costs, and pre and post-judgment interest.

SEVENTH CAUSE OF ACTION
FAILURE TO PROVIDE 195.1 NOTICE
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

209.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as if fully set forth herein.

210.    Defendants willfully failed to supply Plaintiffs and the Class Members with the required Notice and Acknowledgement of Pay Rate and Payday under N.Y. Lab. Law § 195.1(a) within 10 business days of their first employment date.

211.    Due to Defendants' violations of N.Y. Lab. Law § 195.1 through February 26, 2015, Plaintiffs and the Class Members are entitled to recover from Defendants $50.00 for each work week that the violations occurred or continue to occur or a total of $2,500.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab. Law § 198(1)-b (2014).

212.    Due to Defendants' violations of N.Y. Lab. Law § 195.1 on or after February 27, 2015, Plaintiffs and the Class Members are entitled to recover from Defendants $50.00 for each workday that the violations occurred or continue to occur, or a total of $5,000.00, reasonable attorneys' fees, costs, injunctive and declaratory relief. N.Y. Lab. Law § 198(1)-b (2016).

EIGHTH CAUSE OF ACTION
FAILURE TO PROVIDE 195.3 WAGE STATEMENT
UNDER THE NEW YORK LABOR LAW
(On Behalf of Plaintiffs and the Class Members)

213.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as if fully set forth herein.

214.    Defendants have willfully failed to supply Plaintiffs and the Class Members with the required accurate wage statements with every payment of wages, violating Labor Law § 195.3.

215.    Due to Defendants' violations of Labor Law § 195.3, Plaintiffs and the Class Members are entitled to recover from Defendants $100.00 for each work week that the violations occurred or continue to occur, or a total of $5,000.00, as provided for by Labor Law § 198(1)-d, reasonable attorneys' fees, costs, injunctive and declaratory relief.

<u>NINTH CAUSE OF ACTION</u>
GENDER DISCRIMINATION AND SEXUAL HARASSMENT
UNDER THE NEW YORK CITY HUMAN RIGHTS LAW
(On Behalf of Plaintiffs Raiter and Samoylova)

216.    Plaintiffs Raiter and Samoylova reallege every allegation of the preceding paragraphs as if fully set forth herein.

217.    At all relevant times, Plaintiffs Raiter and Samoylova were "employee(s)" and "person(s)" and Defendants were an "employer(s)" under the NYCHRL.

218.    Plaintiffs Raiter and Samoylova were subject to gender discrimination, sexual harassment and treated less well than their male colleagues because of their gender, violating N.Y.C. Admin. Code § 8-107(1)(a).

219.    Chef Lena had the authority to affect Plaintiffs Raiter and Samoylova's employment terms and conditions, including by firing and hiring them.

220.    Defendants are strictly liable for the actionable hostile and discriminatory environment created by its management and supervisors, including Chef Lena, who had immediate or successively higher authority over Plaintiffs Raiter and Samoylova.

221.    Defendants knew or should have known of the constant and ongoing discrimination, hostile work environment and the sexual harassment against their female

employees but failed to take any remedial steps for so long as to amount to a continuous discriminatory policy and practice.

222.    Defendants' gender discrimination, hostile work environment and the sexual harassment against Plaintiffs Raiter and Samoylova and other similarly situated female employees were continuous violations of NYCHRL.

223.    Continuing violation doctrine applies to Defendants' acts of discrimination, harassment and hostile environment against Plaintiffs Raiter and Samoylova because they permitted specific and related instances of discrimination to continue unremedied for so long as to amount to a discriminatory policy and practice, and, accordingly, a longer statute of limitations applies to any discriminatory act, harassment and hostile environment that would have been time-barred otherwise, making them timely and actionable.

224.    As a result of Defendants' harassment of them, Plaintiffs Raiter and Samoylova have suffered and continue to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

225.    Defendants harassed and discriminated against Plaintiffs Raiter and Samoylova with malice and reckless indifference to their rights under the NYCHRL.

226.    As a result of Defendants' unlawful conduct, Raiter and Samoylova can recover punitive damages. N.Y.C. Admin. Code § 8-502.

## TENTH CAUSE OF ACTION
### GENDER DISCRIMINATION AND SEXUAL HARASSMENT
### UNDER NEW YORK STATE HUMAN RIGHTS LAW
#### (On Behalf of Plaintiffs Raiter and Samoylova)

227.    Plaintiffs Raiter and Samoylova reallege every allegation of the preceding paragraphs as if fully set forth herein.

228.    At all relevant times, Plaintiffs Raiter and Samoylova were "employee(s)" and "person(s)" and Defendants were "employer(s)" under the NYSHRL.

229.    The NYSHRL prohibits employment discrimination and harassment based on gender. N.Y. Exec. Law § 296(1)(a).

230.    Plaintiffs were subjected to unwelcomed sexual conduct in the workplace that constitutes sex-based harassment.

231.    Defendants' workplace was permeated with discrimination that was sufficiently severe and pervasive to alter the conditions of Plaintiffs' work environment and create an abusive working environment.

232.    Chef Lena had the authority to affect Plaintiffs Raiter and Samoylova's employment terms and conditions, including by firing and hiring them.

233.    Defendants are vicariously liable for the actionable hostile and discriminatory environment created by its management and supervisors, including Chef Lena, who had immediate or successively higher authority over Plaintiffs Raiter and Samoylova.

234.    Defendants' gender discrimination, hostile work environment and the sexual harassment against Plaintiffs Raiter and Samoylova and other similarly situated female employees were continuous violations of NYSHRL.

235.    Continuing violation doctrine applies to Defendants' acts of discrimination, harassment and hostile environment against Plaintiffs Raiter and Samoylova because they permitted specific and related instances of discrimination to continue unremedied for so long as to amount to a discriminatory policy and practice, and, accordingly, a longer statute of limitations applies to any discriminatory act, harassment and hostile environment that would have been time-barred otherwise, making them timely and actionable.

236.    As a result of Defendants' harassment of them, Plaintiffs Raiter and Samoylova have suffered and continue to suffer, *inter alia*, loss of wages, emotional distress, mental anguish, emotional pain and suffering, inconvenience, and loss of enjoyment of life.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Collective Action Members, respectfully requests this Court grant the following relief:

a.    Accepts jurisdiction over this matter;

b.    Impanels and charges a jury with respect to the causes of action;

c.    Certifying this action as a class action under Fed. R. Civ. P. 23(b)(2) and (3) on behalf of the Rule 23 Class Members and appointing Plaintiffs and their counsel to represent the Class Members;

d.    Designating this action as a collective action on behalf of the Collective Action Members and prompt issuance of notice under 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue under 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to

represent the Collective Action Members and tolling of the statute of limitations;

e.     A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the Labor Law;

f.     An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

g.     An award for unpaid minimum wage under the Labor Law;

h.     An award for unpaid overtime premium pay under the Labor Law and the FLSA;

i.     An award for unpaid spread-of-hours pay under the Labor Law;

j.     An awarded for unlawful deductions under the Labor Law and the FLSA;

k.     An award for reimbursement of uniform-related expenses, business-related expenses and for unlawful deductions under the Labor Law;

l.     An award for failing to provide the N.Y. LAB. LAW § 195.1 Notice;

m.     An award for failing to provide the N.Y. Lab. Law § 195.3 Wage Statements;

n.     An award of liquidated damages as a result of Defendants' Labor Law violations;

o.     An award of liquidated damages as a result of Defendants' willful FLSA violations;

p.     Equitably tolling the statute of limitations under the FLSA;

q.      An award to Plaintiffs Raiter and Samoylova for back pay, front pay and all benefits along with pre and post judgment interest in the amount of at least $250,000.00.

r.      An award to Plaintiffs Raiter and Samoylova for punitive, liquidated and compensatory damages including damages for pain and suffering, anxiety, humiliation, loss of enjoyment of life, emotional distress in order to compensate her for the injuries she has suffered and to signal to other employers that discrimination is repulsive to legislative enactments in the amount of at least $500,000.00.

s.      An award of pre-judgment and post-judgment interest;

t.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

u.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all questions of fact the Complaint raises.

Dated: New York, New York
        August 5, 2021

LIPSKY LOWE LLP


s/ Douglas B. Lipsky
Douglas B. Lipsky
Milana Dostanitch
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
212.392.4772
doug@lipskylowe.com
milana@lipskylowe.com